**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EMILE AHMED MERZOUG | ) | Case No. 11-10372-BFK |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| WOOJONG HONG, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 11-01228 |
| | ) | |
| EMILE AHMED MERZOUG | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION**

This matter came before the Court for a trial on the merits on the Plaintiffs' Complaint to determine the dischargeabilty of a debt pursuant to 11 U.S.C. § 523(a)(2)(A). The Plaintiffs claim that the Debtor, Mr. Merzoug, induced them to make an investment of $500,000 in an oil and gas concern that came to be known as Whistler, LLC, based on false representations. The Court finds the debt to be non-dischargeable.

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 1334, and the Order of Reference entered by the U.S. District Court for the Eastern District of Virginia on August 15, 1984. The determination of the dischargeability of debts, or not, is a core proceeding under 28 U.S.C. § 157(I). Both sides agreed at the outset of the case that they consented to the entry of final orders by the Bankruptcy Court. 28 U.S.C. § 157(c)(2); *Commodity Futures Trading Com. v. Schor,* 478 U.S. 833, 848–49 (1986) ("[A]s a personal right, Article III's guarantee of an

1

impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried"). The Court, therefore, has subject matter jurisdiction to determine the dischargeability of the debt, and to enter a final money judgment against the Defendant.

### Findings of Fact

The Court, having heard the testimony of the witnesses and reviewed the Exhibits of the parties, makes the following findings of fact:

1. Mr. Hong presently works as a realtor. He has a Master's degree in mechanical engineering. He is working on his Ph.D. in the same field.

2. In 2007, Mr. Hong was working for Ameribanc as a residential loan officer. His supervisor was the Debtor's son, Sam Merzoug. Although not entirely clear from the testimony, it appears that one or more members of the Merzoug family were substantial stockholders in Ameribanc. Mr. Hong testified that he believed that another of the Debtor's sons, Mike Merzoug, "owned" Ameribanc. The Debtor, in his testimony, described Ameribanc as "one of my companies."

3. Mrs. Hong decided that she was going to open a beauty salon. To this end, she and Mr. Hong submitted their personal financial information (personal financial statement, bank statements, and the like) to Mike Merzoug, who worked for the commercial lending division of Ameribanc.

4. In May 2007, the sons (Mike and Sam Merzoug) suggested to the Hongs that they should meet the sons' father, Emile Merzoug, the Debtor in this case.

5. Mr. and Mrs. Hong first met the Debtor (hereinafter "Mr. Merzoug") in June 2007. They discussed the possibility of Mr. and Mrs. Hong investing in a company that had oil and gas leases in the Gulf of Mexico.

6. Mr. Merzoug told the Hongs that he had a 50% partner, a Mr. Frankel, whom he, Mr. Merzoug, deemed to be untrustworthy. Mr. Merzoug further told the Hongs that he wanted to remove Mr. Frankel as his partner in the oil and gas business.

7. Mr. Merzoug also represented to the Hongs that a hurricane had destroyed the equipment being used in the oil and gas business, and that he had insurance proceeds to replace the equipment.

8. Mr. Merzoug represented that he needed the Hongs to invest because he, Mr. Merzoug, was not a U.S. citizen, and under the Patriot Act, he needed a U.S. citizen involved to hold the investment.

9. Mr. Merzoug described the proposed investment, of $500,000, as a small fraction of the capitalization of the entire enterprise, and further represented that the Hongs could get their money out "at any time."

10. Mr. Merzoug represented, as well, that he was "very rich," and he gave the appearance to the Plaintiffs of success and wealth.

11. Mr. Merzoug further represented to the Plaintiffs that the oil and gas business would be up and running within 2 to 3 months.

12. The Hongs agreed to make an investment of $500,000, in exchange for which they were to receive either a 5% interest in the business, if Mr. Merzoug were successful in removing his partner, Mr. Frankel, or a 10% interest in Mr. Merzoug's one half of the business (amounting to the same thing), if he was not successful in removing Mr. Frankel from the business.

13. Neither of the Hongs had any prior experience investing in oil and gas leasing businesses.

14. Mr. Merzoug exerted some sales pressure on Mr. Hong, representing that Mr. Hong was the "last one in" to the investment, that he, Mr. Merzoug, was going to New York the following day to meet with his investors, and that Mr. Hong needed to make his investment that day, or lose out on the opportunity.

15. Furthermore, Mr. Merzoug offered to put up, as collateral for the $500,000 investment, 300 shares in a company that he owned, known as World Developments Corporation ("WDC"). The parties agreed that the WDC shares would serve as collateral until the Hongs were provided with their investment in the oil and gas venture. This agreement was evidenced by an Affidavit, executed by Mr. Hong at around the time of the investment. Plaintiffs' Exh. 7.

16. The Hongs paid the first $250,000 to Mr. Merzoug on July 16, 2007. Plaintiffs' Exh. 5.

17. They paid the second $250,000 to Mr. Merzoug on July 26, 2007. Plaintiffs' Exh. 6.

18. The funds were deposited into the account of WDC, and were used solely for its business expenses. Defendants' Exh. A-4, p. 6. Within two months, the entire investment of $500,000 was gone. *Id.* at 16. By the end of the September 2007, WDC had only $16,183.11 in its bank account, the same account to which the Plaintiffs' entire investment had been deposited. *Id.*

19. At the same time the Hongs made their investment, on July 16, 2007, Mr. Hong left his employment with Ameribanc, and went to work for WDC. It isn't entirely clear what Mr. Hong's responsibilities were at WDC. Mr. Hong testified that he traveled to South Korea and

acted as an interpreter for discussions with a Korean company with which WDC was seeking to do business.

20. When the end of July came and went, Mr. and Mrs. Hong became concerned about their investment. The paycheck Mr. Hong received for his work at WDC for the month of July bounced and had to be replaced with another check.

21. In August, the Hongs became increasingly concerned, and asked for their money back. Mr. Merzoug assured them on repeated occasions that he would repay them their investment. He provided them with a Personal Financial Statement, Plaintiffs' Exh. 9,[1] as well as a corporate financial statement for WDC. Plaintiffs' Exh. 10.

22. Eventually, the oil and gas concern came to be known as Whistler, LLC, or Whistler Offshore, LLC ("Whistler"). Whistler was incorporated as a limited liability company in July 2007. Defendant's Exh. H. In August and September 2007, an Operating Agreement was created, but never signed by the parties. Defendant's Exh. I-3.

23. Whistler never became operational. It never had a bank account. Further, the Court concludes that Whistler never had any oil and gas leases in the Gulf of Mexico, nor any equipment that was being replaced by insurance proceeds.[2]

24. In August and September 2008, the Hongs began demanding their money back via increasingly demanding e-mails and phone calls. Plaintiffs' Exhs. 11-17. Mr. Merzoug, for his part, stalled, and eventually agreed to pay them some interest on their money. *Id.*

---

[1] Mr. Merzoug denied the authenticity of this document, but the Court finds that this statement was something that was prepared by Mr. Merzoug and given to the Plaintiffs.
[2] The Court takes judicial notice that, in his Schedule B in this case, Mr. Merzoug listed the ownership of a 50% interest in "Whistler Energy Off Shore, LLC," to which he assigned a value of $1.00.

5

25. In September 2008, Mr. Merzoug signed two Promissory Notes, personally agreeing to repay the money. Plaintiffs' Exhs. 16 and 17. Mr. Merzoug made no effort to repay these notes.

26. From time to time, in response to the Plaintiffs' demands for repayment, Mr. Merzoug assured the Hongs that the money would be deposited to their account. The money was never deposited.

27. Mr. Hong eventually was let go from WDC.

28. No portion of the $500,000 has been repaid, and the 300 shares of WDC stock taken as collateral are worthless.

## Conclusions of Law

Under Section 523(a)(2)(A), in order to prove "false pretenses, a false representation, or actual fraud," the Plaintiffs must prove that the Debtor "made a representation; [that] the debtor knew the representation was false at the time the representation was made; [that] the debtor made the false representation with the intention of deceiving the creditor; [that] the [Plaintiffs] justifiably relied on the representation; and [that] the [Plaintiffs] sustained the alleged loss and damage as the proximate result of the false representation." *Fowler v. Garey (In re Garey)*, 258 B.R. 356, 361 (Bankr. E.D. Va. 2000) (citing *Parker v. Grant (In re Grant)*, 237 B.R. 97, 112 (Bankr. E.D. Va. 1999)). The burden of proof on these issues rests with the Plaintiffs. *Grogan v. Garner,* 498 U.S. 279 (1991). The standard of proof is by a preponderance of the evidence. *Id.*

In 1995, the Supreme Court issued its decision in the case of *Field v. Mans*. 516 U.S. 59 (1995). In *Field v. Mans*, the Court decided that, in order to prove a case of actual fraud under Section 523(a)(2)(A), the Plaintiffs needed only to prove "justifiable reliance," not the more

6

demanding standard of "reasonable reliance." *Id.* at 77. Relying on the Restatement (Second) of Torts, as well as W. Prosser, *Law of Torts*, (4th Ed. 1971), the Court explained the standard of justifiable reliance as follows:

> … a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." [Restatement (Second) of Torts], § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walked across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. [Restatement (Second) of Torts], § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.,* § 545A, Comment *b.*

*Id.* at 70-71.

In order to qualify as "actual fraud" under Section 523(a)(2)(A), the statements made must be of existing fact, or made with a present intent not to perform. *Structured Invs. Co., LLC v. Dunlap (In re Dunlap)*, 458 B.R. 301, 329 (Bankr. E.D. Va. 2011) (indicating that, in order to satisfy the representation element, a creditor must "'demonstrate that the representation was one of existing fact and not merely an opinion, expectation or declaration of intention. A mere promise to repay, and nothing more, does not rise to the level of a representation under § 523(a)(2)'" (quoting *Williams v. White (In re White)*, 412 B.R. 860, 866 (Bankr. W.D. Va. 2009))). As a matter of law, statements of performance in the future cannot constitute actual fraud, absent a present intent not to perform. *Soheily v. Vuong (In re Vuong)*, 353 B.R. 860, 866 (Bankr. E.D. Va. 2006) (holding that "[a] mere failure to keep a promise of future performance . . . does not constitute fraud unless at the time the promise was made the debtor had no intention

of carrying through"). *See also Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 812 (E.D. Va. 1997) (indicating that, "'[t]o invoke § 523(a)(2), the fraud must have existed at the time of, and been the methodology by which, the money, property or services were obtained'" (quoting *Wilcoxon Construction, Inc. v. Woodall*, 177 B.R. 517, 523 (D. Md. 1995))).

In this case, the Plaintiffs claim that Mr. Merzoug made the following misrepresentations:

- That Whistler would be formed, and would be up and running in no more than 2 to 3 months;
- That there were investors in New York, who had put their money in, or who were about to put their money in;
- That the split with Mr. Frankel had not yet occurred;
- That the funds were to be deposited in a Whistler account, not in WDC's account.

The Court can easily dispose of the last two of these alleged misrepresentations. There is no evidence that Mr. Merzoug ever agreed to hold the funds in escrow, or to deposit them into a Whistler account. The Plaintiffs were buying a portion of Mr. Merzoug's equity in Whistler (5% or 10%, depending on the outcome of the Frankel discussions), not capitalizing Whistler itself. Whistler was not issuing new membership interests; rather, Mr. Merzoug was selling a part of his equity interest in Whistler to the Plaintiffs. Mr. Hong testified that he was of the understanding that the funds would be used to "operate the company" (Whistler, not WDC), but there are no documents to support this. The fact that Mr. Merzoug used the money to fund his other business, WDC, is not in and of itself evidence of fraud. Also, the Court accepts that the split with Mr. Frankel had not yet occurred at the time the Hongs made their investment in Whistler.

On the other hand, the Court concludes that Mr. Merzoug made the first two misrepresentations – that Whistler would be up and running within 2-3 months, and that there were investors in New York who had put their money in, or who were about to put their money in – and that these statements were false, were made with an intent to deceive, and were

justifiably relied upon by the Plaintiffs to their detriment. All of the discussions between Mr. Merzoug and Mr. Hong, in which they discussed "oil and gas leases," operated on the premise that there was in fact something of substance in which to invest. The Court finds that Whistler never had any economic substance. As far as the Court can tell, it never had any oil and gas leases. It never bid for any oil and gas leases in the Gulf of Mexico, or elsewhere. It never opened a bank account. It never had any investors in New York (or elsewhere, other than the Plaintiffs). It never completed any corporate formalities, other than its bare-bones Certificate of Incorporation in Delaware. The so-called investment in Whistler was, unfortunately, just a way of separating the Plaintiffs from their money so that Mr. Merzoug could use the funds in his existing business, WDC. The repeated mention of "oil and gas leases" by Mr. Merzoug, in which the Plaintiffs could invest, was in and of itself a fraud. The statement that Whistler would be up and running within a matter of a few months, while not a statement of existing fact, was a statement made by Mr. Merzoug without any present intent or ability to perform, and Mr. Merzoug knew it. There was absolutely no way that Whistler could be up and running within 2 to 3 months, as represented by Mr. Merzoug to the Plaintiffs – it had no oil and gas leases, and it was not bidding on any oil and gas leases at the time the investment was made by the Plaintiffs.

Although the burden of proof remained with the Plaintiffs throughout the case, the Court further notes that Mr. Merzoug never offered any evidence to support the assertion that Whistler ever had any economic substance to it. Mr. Merzoug never introduced into evidence any oil and gas leases, nor any bids for oil and gas leases; never produced any maps showing where the oil and gas leases were located; never produced any operating agreements showing who was actually going to be operating the oil and gas wells for Whistler; never produced evidence of a bank account for Whistler; never produced any schedules of equipment that was being repaired

or replaced; never introduced into evidence any documents evidencing an insurance policy, or insurance proceeds; and never produced any evidence, not a single e-mail, bank deposit or subscription agreement, of the existence of any investors in New York or elsewhere.

The Court finds that these representations were made with knowing falsity. Mr. Merzoug was in the exclusive position to know the status of Whistler, its leases, equipment, insurance proceeds, and investors, if any. He had actual knowledge of all matters related to Whistler at the time of the Plaintiff's investment.

Further, the Plaintiffs justifiably relied on the statements made to them by Mr. Merzoug in making the investment. As noted above, under *Field v. Mans*, this burden is a relatively slight one – there is no requirement of due diligence. The Plaintiffs relied on the appearance of wealth and success that Mr. Merzoug fostered. The Plaintiffs were relative novices, with no experience investing in oil and gas leases. Mr. Merzoug held himself out as having substantial experience in these matters. The Court concludes that the Plaintiffs justifiably relied on the statements made by the Defendant that there were in fact oil and gas leases, that Whistler was (or at least, could be within a relatively short period of time) an enterprise with economic substance, that it could be up and running within a few months, and that it had a substantial pool of investors.

Finally, the Court finds that the Plaintiffs were damaged as a direct result of their reliance on Mr. Merzoug's false representations, in the amount of $500,000, and their costs in this action.

## Conclusion

For the foregoing reasons, the Court finds Mr. Merzoug's debt to the Plaintiffs, in the amount of $500,000 plus interest at the federal judgment rate from July 16, 2007, on $250,000, and from July 26, 2007, on $250,000, plus costs, to be non-dischargeable pursuant to 11 U.S.C. §

523(a)(2)(A).  The Court will enter a separate Order: (a) entering judgment on the foregoing amounts; and (b) determining these amounts to be non-dischargeable.

Date: _____
Brian F. Kenney
United States Bankruptcy Judge

Copies to:

Woojong Hong
Mi Ae Hong
8505 Bersky Lane
Lorton, VA 22079
Plaintiffs

Joelle Erica Gotwals, Esquire
The Metropolitan Law Group
8230 Boone Blvd
Ste 370
Vienna, VA 22182
Counsel for the Plaintiffs

Emile Ahmed Merzoug
6501 Deerborn St.
Falls Church, VA 22044
Defendant

Neil Spencer Welles, Esquire
The Lilly Law Group, PC
10195 Main St. Ste I
Fairfax, VA 22031
Counsel for the Defendant